# IN THE COURT OF APPEALS OF TENNESSEE, WESTERN SECTION
## AT JACKSON

_____

<table>
<tr><td>

**JONA MCCRACKEN, et al**,

   Plaintiff/Appellee/Cross-Appellant.

VS.

**CITY OF MILLINGTON, TENNESSEE,**

   Defendant/Appellant/Cross-Appellee.

</td><td>

Shelby County Circuit Court
No. 53344-7

C.A. No. 02A01-9707-CV-00165

**FILED**

**March 17, 1999**

**Cecil Crowson, Jr.**
Appellate Court Clerk

</td></tr>
</table>

_____

From the Circuit Court of Shelby County at Memphis.
**Honorable Robert A. Lanier, Judge**


**John C. Duffy**, WATSON, HOLLOW & REEVES, Knoxville, Tennessee
**Charles A. Sevier,**
**Reid R. Phillips**,
SEVIER & PHILLIPS, Memphis, Tennessee
Attorneys for Defendant/Appellant/Cross-Appellee City of Millington, Tennessee.


**R. Sadler Bailey**,
**Andrew C. Clarke**,
BAILEY & CLARKE, Memphis, Tennessee
Attorneys for Plaintiff/Appellee/Cross-Appellant.



OPINION FILED:

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED**


**FARMER, J.**

**CRAWFORD, P.J.,W.S.**: (Concurs)
**HIGHERS, J.**: (Concurs)

This action for personal injuries and wrongful death arises out of an automobile accident between a vehicle containing two fleeing bank robbery suspects and a vehicle containing Trevor McCracken, his wife Jona McCracken, and their daughter Jessica McCracken. The trial court found that the negligence of two police officers employed by the Defendant City of Millington was a twenty-five percent proximate cause of this accident and ordered the City of Millington to pay $130,000.00 for the wrongful death of Trevor, $46,250.00 for the personal injuries of Jona, $20,077.00 for the personal injuries of Jessica, and $17,335.30 in discretionary costs. Both parties have appealed. Because we find that the trial court should not have awarded damages to Jona under the theory of negligent infliction of emotional distress and further find that the trial court abused its discretion when awarding discretionary costs, we reverse the ruling of the trial court with respect to these issues. In all other respects, the ruling of the trial court is affirmed.

### *Factual History*

On April 24, 1992, two armed suspects robbed the Bank of Mason in Mason, Tennessee. A description of the suspects and their vehicle, including its license plate number, was broadcast by the dispatchers of law enforcement agencies in the surrounding area. Trooper Robert Pugh of the Tennessee Highway Patrol heard the broadcast and began looking for the suspects in his marked patrol car. While heading northbound on Brunswick Road, Trooper Pugh encountered the suspects traveling southbound on Brunswick Road at between twenty-five and thirty miles per hour. As Trooper Pugh applied his brakes in order to turn around, the suspects began to flee at a high rate of speed, making a right hand turn onto State Road 205. Trooper Pugh engaged in a high speed chase with the suspects, at times reaching speeds in excess of 100 miles per hour. As the vehicles approach the intersection of State Road 205 and Highway 14, however, Trooper Pugh slowed down because of the possibility that there might be traffic at that intersection. The suspects did not slow down, but instead raced through the intersection at a high rate of speed, running a third party off the road. After losing sight of the suspects, Trooper Pugh used the radio in his patrol car to notify other law enforcement personnel that the suspects were on State Road 205 heading toward Millington.

On the day of the robbery in Mason, Officers Mike Rose and Reginald Fields of the Millington Police Department were scheduled to work from 3:00 to 11:00 p.m. They arrived at the

Millington Police Station at approximately 2:30 p.m. and were advised by the dispatcher that there were two fleeing bank robbery suspects heading toward Millington. Because there were no police vehicles available for Officers Rose and Fields to use, Officer Rose requested permission to search for the suspects in his private vehicle, a pick-up truck. Although Rose's vehicle was not equipped with permanent lights or sirens, there was a dash-mounted blue light in the truck that could be activated by plugging it into the cigarette lighter. Lieutenant R. E. Wilson authorized Officers Rose and Fields to look for the suspects in Rose's pick-up truck but specifically instructed them not to chase or pursue the suspects.

Officers Rose and Fields encountered the suspects while traveling eastbound on Navy Road and began to follow them. At this point, the officers were close enough to the suspects' vehicle to read the information on the suspects' license plate. Officer Fields attempted to activate the dash-mounted blue light in Officer Rose's pick-up truck but it blew out after only one revolution. Additionally, Officers Rose and Fields attempted to contact the dispatcher at the Millington Police Department with their hand-held radios but were unsuccessful. After switching the frequency of his radio, Officer Rose was able to contact the dispatcher of the Shelby County Police Department. Approximately thirty seconds later, Officer Rose notified the Shelby County dispatcher that they were behind the suspects' vehicle at Navy Road and Bethuel Road. He then informed the Shelby County dispatcher that the suspects had turned left and were heading northbound on Bethuel Road. Approximately 300-400 yards from the intersection of Navy Road and Bethuel Road, Officer Rose noticed the patrol car of Trooper Pugh, which was positioned in the roadway facing west with its blue lights activated. As Officers Rose and Fields approached the intersection, they were forced to stop behind a gravel truck that was in the left-hand turn lane. Officer Rose flashed the headlights of his pick-up truck in an attempt to signal other drivers to yield and then proceeded to drive around the gravel truck, making a left turn onto Bethuel Road. As Officers Rose and Fields approached the intersection of Bethuel Road and Coronado, Officer Fields observed flying debris and noticed that the suspects had collided with another vehicle.

Trevor McCracken, age twenty-two, was driving the vehicle that was struck by the bank robbery suspects. Trevor's wife Jona McCracken, also age twenty-two, and their twenty-two month old daughter Jessica were passengers in the vehicle. Both Jona and Jessica were asleep at the

time that the accident occurred. Jona's first memory after the accident is that she was lying in the grass and could hear the voices of paramedics. Jona also remembered being inside an ambulance on a stretcher. While inside the ambulance, Jona observed that Jessica was crying and was holding her arms out to her. Both Jona and Jessica were transported to The Naval Hospital. Jona was treated for a severely sprained left ankle, a severely bruised upper thigh, and various cuts, bumps, and bruises while Jessica was treated for a broken leg. Trevor was initially taken to The Naval Hospital but later was transported by helicopter to The Med in Memphis. On April 26, 1992, Jona was allowed to visit her husband at The Med. She observed that Trevor was unconscious, hooked up to a respirator and a heart monitor, had an IV in his arm, and was extremely swollen. Approximately fifteen minutes after her visit with Trevor, Jona was notified that her husband had died. Four months after the accident, Jona went to see Dr. Radwan Khuri, a psychiatrist, for an evaluation of her mental health. Concluding that Jona was suffering from a "grief reaction," Dr. Khuri gave Jona a prescription for sleeping pills and advised her to consider individual counseling. Jona's only permanent physical injury is that there is scar tissue on her upper thigh that, if bumped, causes Jona to experience pain.

### *Procedural History*

On April 23, 1993, Jona filed a complaint in her individual capacity and in a representative capacity on behalf of Trevor and Jessica against a variety of governmental entities and employee's thereof.[1] With the exception of the City of Millington, each of these defendants has been dismissed on a motion to dismiss, on a motion for summary judgment, or by voluntary non-suit. The matter came to be heard on June 30, 1997 through July 2, 1997. The trial judge, sitting without a jury,[2] took the matter under advisement. In a memorandum opinion issued on July 10, 1997, the trial court found that the negligence of Officers Rose and Fields was a twenty-five percent proximate

---

[1]The named defendants include Finde Naifeh, Jr., Calvin Blade, the City of Mason Police Department, the City of Mason, William Morris, Alton C. Gillis, the Shelby County Sheriff's Department, the County of Shelby, Tennessee, Jeff Huffman, Clyde D. "Buddy" Lewis, Jr., the Tipton County Sheriff's Department, the County of Tipton, Tennessee, George R. Harvell, Jr., John Hall, the City of Millington Police Department, the City of Millington, Tennessee, W. W. Herenton, Melvin Burgess, the City of Memphis Police Department, the City of Memphis, Tennessee, and unknown officers one through twenty.

[2]There is no right to a jury trial with respect to actions brought pursuant to the Tennessee Governmental Tort Liability Act. *See* Tenn. Code Ann. § 29-30-307 (Supp. 1998).

cause of the automobile accident involving Trevor, Jona, and Jessica. Additionally, the court

assessed the damages in this matter at $1,906,393.29 for the wrongful death of Trevor, $185,000.00

for the personal injuries of Jona, and $80,308.00 for the personal injuries of Jessica. Taking into

account the Defendant's degree of fault and the limits imposed by the Tennessee Governmental Tort

Liability Act,[3] the court entered a judgment against the Defendant in the amount of $130,000.00 for

the wrongful death of Trevor, $46,250.00 for the personal injuries of Jona, and $20,077.00 for the

personal injuries of Jessica. The Defendant filed a notice of appeal. Thereafter, the Plaintiff filed

a motion for discretionary costs totaling $21,957.80. Additionally, the Plaintiff amended her motion

for discretionary costs to reduce the amount sought for the expert witness fees of Dr. Geoffrey P.

Alpert and Michael Cosgrove. The trial judge entered an order granting in part and denying in part

the Plaintiff's motion for discretionary costs. The Defendant also appeals this ruling of the trial

court.

### *Issues*

The issues raised by the parties on appeal, as we perceive them, are as follows:

I.    Did the trial court err in finding that the actions of Officers Rose and Fields were a cause in fact of the injuries sustained by Trevor, Jona, and Jessica?

II.   Did the trial court err in finding that, in exceeding the speed limit while in a vehicle without emergency equipment, Officers Rose and Fields violated a duty of care owed to Trevor, Jona, and Jessica?

III.  Did the trial court err in finding that the negligence of Officers Rose and Fields was a twenty-five percent proximate cause of the injuries sustained by Trevor, Jona, and Jessica?

IV.   Did the trial court err in finding that Jona had sustained compensatory damages totaling $175,000.00 when, in her complaint, Jona sought only $100,000.00 in compensatory damages?

V.    Did the trial court err in awarding damages for Jona's emotional injuries under the theory of negligent

---

[3]Under the Tennessee Governmental Tort Liability Act, the maximum amount of damages that a plaintiff can recover from a municipality in a wrongful death or personal injury action is $130,000.00 per injured party and $350,000.00 per accident. *See* Tenn. Code Ann. § 29-20-311 (1980); Tenn. Code Ann. § 29-20-403(b)(2)(A) (Supp. 1998).

infliction of emotional distress?

VI.     Do the trial court's findings with respect to Jona's damages permit double recovery for the emotional injuries sustained by Jona as a result of the accident?

VII.     Did the trial court err in finding that Jessica had sustained a total of $80,308.00 in damages as a result of the accident?

VIII.     Did the trial court err in awarding the Plaintiffs $17,335.30 in discretionary costs?

VIV.     Did the trial court err in failing to award damages to Jona and Jessica for loss of spousal and parental consortium resulting from the wrongful death of Trevor?

X.     Did the trial court err in comparing the fault of Officers Rose and Fields with the fault of the fleeing bank robbery suspects?

### *Standard of Review*

When a civil action is heard by a trial judge sitting without a jury, our review of the matter is *de novo* on the record, accompanied by a presumption of correctness of the findings below. *See, e.g., Foster v. Bue*, 749 S.W.2d 736, 741 (Tenn. 1988); T.R.A.P. 13(d). We may not reverse the findings of fact made by the trial judge unless they are contrary to the preponderance of the evidence. *See, e.g., Jahn v. Jahn*, 932 S.W.2d 939, 941 (Tenn. App. 1996). This presumption of correctness, however, does not attach to the trial judge's legal determinations or the trial court's conclusions that are based on undisputed facts. *See, e.g., NCNB Nat'l Bank v. Thrailkill*, 856 S.W.2d 150, 153 (Tenn. App. 1993).

### *Causation in Fact*

We first consider whether the conduct of Officers Rose and Fields was a cause in fact of the injuries sustained by Trevor, Jona, and Jessica. A defendant's conduct may be classified as a cause in fact if, but for the defendant's conduct, the plaintiff's injury would not have occurred. *See, e.g., Snyder v. LTG Lufttechnische GmbH*, 955 S.W.2d 252, 256 n.2 (Tenn. 1997). In the instant case, the Defendant argues that the bank robbery suspects were unaware that they were being pursued by Officers Rose and Field and thus were not attempting to flee from these officers. Rather,

the Defendant contends that the bank robbery suspects were traveling at a high rate of speed and driving in a reckless manner in order to avoid apprehension by other law enforcement officers who had previously pursued the suspects, including Trooper Pugh.

We think that there is ample evidence in the record to support the trial court's finding that the bank robbery suspects were, in fact, fleeing from Officers Rose and Fields rather than other law enforcement officers. When Officers Rose and Fields first encountered the suspects, they were able to get close enough to read the information on the suspects' license plate. The officers followed the suspects at speeds well in excess of the speed limit, which was forty miles per hour. Although the officers themselves estimated their rate of speed to be between fifty and sixty-five miles per hour, Trooper Pugh testified that he observed Officers Rose and Fields traveling at between eighty and eighty-five miles per hour. While following the suspects, Officer Rose flashed the headlights of his pick-up truck and drove around a gravel truck that was stopped in a left-hand turn lane, making a left turn onto Bethuel Road. We also think it is significant that, as Officers Rose and Fields approached the accident site, Officer Fields observed flying debris. This suggests that the officers must have remained in close proximity to the fleeing suspects throughout the pursuit. Under such circumstances, there is a substantial likelihood that the bank robbery suspect knew that they were being pursued by Officers Rose and Fields. In attempting to avoid apprehension by these officers, the bank robbery suspects drove in a reckless manner. Consequently, the suspects crashed into the McCracken vehicle. Thus, we agree with the trial court's finding that the conduct of Officers Rose and Fields was a cause in fact of the injuries sustained by Trevor, Jona, and Jessica.

### *Breach of Duty*

We next consider whether Officers Rose and Fields breached a duty of care owed to Trevor, Jona, and Jessica. In negligence cases, the phrase "duty of care" refers to the defendant's obligation to conform to the reasonable person standard of care for the protection of the plaintiff from unreasonable risks of harm. *See McClung v. Delta Square Ltd. Partnership*, 937 S.W.2d 891, 894 (Tenn. 1996)(citing *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)). In some cases, the reasonable person standard of care is prescribed by statute. *See Cook v. Spinnaker's of Rivergate, Inc.*, 878 S.W.2d 934, 937 (Tenn. 1994)(citing *McIntyre v. Balentine*, 833 S.W.2d 52, 59 (Tenn.

1992)). If the statute was designed to prevent the type of harm suffered by the plaintiff and the plaintiff is within the class of persons that was intended to be protected by the statute, the violation of such a statute amounts to negligence per se, resulting in a conclusive presumption that the defendant violated a duty of care owed to the plaintiff. *See id.* (citing *Smith v. Owen*, 841 S.W.2d 828, 831 (Tenn. App. 1992)).

The maximum speeds at which a person is permitted to operate a motor vehicle on the highways and public roads of this state are set forth in section 55-8-152 of Tennessee Code Annotated. *See* Tenn. Code Ann. § 55-8-152 (1998).[4] *See also* Tenn. Code Ann. § 55-8-153 (1998)(allowing for downward alteration of these limits in the interest of public safety). In the instant case, the posted speed limit on the roads traveled by Officers Rose and Fields while following the bank robbery suspects was forty miles per hour. There is some disagreement regarding the speed at which Officers Rose and Fields pursued the fleeing bank robbery suspects.[5] It is undisputed, however, that as the bank robbery suspects began to pull away from Officers Rose and Fields, Officer Fields instructed Officer Rose to "punch it." Officer Rose testified that he had the gas pedal pressed to the floor and was traveling as fast as his pick-up truck could run. Officers Rose and Fields estimated that they reached a top speed of fifty to sixty-five miles per hour. Thus, under the officers' own testimony, it is clear that Officers Rose and Fields violated the speed limit in their pursuit of the fleeing bank robbery suspects.

We now consider whether, under the circumstances of the case at bar, the officers' violation of the speed limit amounts to negligence per se. The purpose of imposing a speed limit is to prevent injuries resulting from motor vehicle accidents. These limitations are imposed in the

---

[4]Under section 55-8-108 of the Tennessee Code Annotated, the driver of an authorized emergency vehicle is permitted to exceed the posted speed limit under certain circumstances. *See* Tenn. Code Ann. § 22-8-108 (b)(3) (1998). This privilege only applies, however, when the vehicle is making use of its emergency equipment. *See* Tenn. Code Ann. § 55-8-108(c) (1998). In the instant case, the only emergency equipment in Officer Rose's pick-up truck was a dash-mounted blue light that did not operate properly. Thus, we conclude that this provision did not operate to authorize Officers Rose and Fields to exceed the posted speed limit when pursuing the fleeing bank robbery suspects.

[5]Trooper Pugh testified that he observed Officer Rose's pick-up truck traveling at approximately eighty to eighty-five miles per hour. Additionally, Officer Rose estimated that the truck reached a maximum speed of fifty to sixty-five miles per hour. Finally, Officer Fields testified that the highest speed attained while following the fleeing bank robbery suspects was sixty miles per hour.

interest of public safety and are designed to benefit all persons who utilize the roads of this state. In the instant case, Trevor, Jona, and Jessica sustained injuries as a result of a motor vehicle accident. This is precisely the type of harm that speed limits are designed to prevent. Additionally, as members of the public who were traveling on Tennessee roads, we find that Trevor, Jona, and Jessica were among the class of persons that the speed limit in the instant case was designed to protect. Thus, we conclude that the conduct of Officers Rose and Fields constitutes negligence per se. Accordingly, we must conclusively presume that these officers violated a duty of care owed to Trevor, Jona, and Jessica.

### *Apportionment of Fault*

The trial court found that the negligent conduct of Officers Rose and Fields was a twenty-five percent proximate cause of the injuries sustained by Trevor, Jona, and Jessica. The Defendant argues on appeal the trial court's apportionment of fault was based on erroneous findings with respect to causation and thus, the percentage of fault assigned to Officers Rose and Fields should be substantially reduced. As we explained above, however, we agree with the trial court's finding that the conduct of Officers Rose and Fields was a cause in fact of the accident between the suspects' vehicle and the McCracken vehicle. Thus, we reject this argument of the Defendant.

The trier of fact in a negligence case is afforded a great deal of discretion with respect to its apportionment of fault. *See Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995)(citing *Martin v. Bussert*, 193 N.W.2d 134, 139 (Minn. 1971)). In light of their negligent conduct, it is clear in the instant case that at least some degree of fault should have been assigned to Officers Rose and Fields. Additionally, because of their reckless conduct, we think that a high degree of fault should have been assigned to the bank robbery suspects. The trial court apparently reached the same conclusion, assigning only twenty-five percent of the fault to Officers Rose and Fields. Under the circumstances of the case at bar, we cannot say that the trial court's apportionment of fault is contrary to the preponderance of the evidence.

The Plaintiff also challenges the trial court's apportionment of fault, arguing that the trial court should not have compared the fault of Officers Rose and Fields with the fault of the

fleeing bank robbery suspects. In support of this position, the Plaintiff first contends that such a comparison should not have been made because the Defendant failed to properly raise the issue of comparative fault. Under Rule 8.03 of the Tennessee Rules of Civil Procedure, a defendant who intends to rely on the doctrine of comparative fault "must identify or describe other alleged tortfeasors who should share fault, or else the defendant normally would be barred from shifting blame to others at trial." Advisory Commission Comment [1993] to T.R.C.P. 8.03.

In *George v. Alexander*, 931 S.W.2d 517 (Tenn. 1996), Ethel George began to experience physical problems with her right leg and foot after undergoing a surgical procedure performed by Dr. James Daniell. *See id.* at 518-19. George filed a medical malpractice action against Dr. Phillip Jones and Dr. Clyde Alexander, the physicians who administered George's anesthesia, but did not name Dr. Daniell as a defendant. *See id.* at 519. In their answer to George's complaint, Dr. Jones and Dr. Alexander did not raise the issue of comparative fault. *See id.* Subsequently, however, George took the deposition of Dr. Vaughan Allen, who suggested that George's injury might have occurred because Dr. Daniell improperly positioned her body during the surgery. *See id.* at 519-20. Over the objection of George, the trial court allowed Dr. Allen's deposition to be admitted into evidence. *See id.* at 520. On appeal, the Tennessee Supreme Court reversed the trial court's ruling, holding that, because Dr. Jones and Dr. Alexander failed to alleged comparative fault as an affirmative defense, they could not attempt at trial to shift the blame to Dr. Daniell. *See id.* at 522. In a separate concurrence, one member of the court explained as follows:

> [W]here the defendant does not plead comparative fault, it will be held liable for 100 percent of the plaintiff's damages unless it is absolved of all liability. In other words, where a sole defendant does not plead comparative fault, there will be no apportioning of liability for damages even though the defendant may have been only partially at fault.

*Id.* at 527 (Reid, J., concurring).

In the instant case, the Defendant's answer states in pertinent part as follows:

26. The City of Millington, Tennessee, defendant, relies upon the Doctrine of Comparative Fault. If this defendant, City of

> Millington, Tennessee, was negligent in any manner, then the plaintiffs' recovery must be barred, as the negligence of the plaintiffs and plaintiffs' decedent was greater than the negligence of the City of Millington, Tennessee, if any, and any negligence of any co-defendant must be reduced by the plaintiffs' or the plaintiffs' decedent's percentage of fault.

Thus, although the Defendant raised the doctrine of comparative fault with respect to the conduct of the Plaintiff, the Defendant did not allege that the conduct of the fleeing bank robbery suspects in any way caused or contributed to the Plaintiff's injuries. It appears, then, that, under the court's ruling in *George*, the trial court should not have considered the fault of the fleeing bank robbery suspects when determining the Defendant's degree of fault.

Additionally, the Plaintiff argues that it was improper for the trial court to compare the fault of Officers Rose and Fields with the fault of the fleeing suspects because conduct of the suspects was intentional. In *Turner v. Jordan*, 957 S.W.2d 815 (Tenn. 1997), Emma Turner, a nurse who worked at a Nashville hospital, was attacked and severely beaten by Tarry Williams, a psychiatric in-patient at the hospital. *See id.* at 816. On the day of the attack, Williams was interviewed by Dr. Harold Jordan who found Williams to be "aggressive, grandiose, intimidating, combative, and dangerous." *Id.* at 817. Despite this finding, Dr. Jordan made no attempt to protect Turner from the risk of harm created by the presence of Williams at the hospital. *See id.* at 817. In a negligence action brought by Turner against Dr. Jordan, the trial court instructed the jury that, in apportioning fault, it could compare the alleged intentional conduct of Williams with the alleged negligent conduct of Dr. Jordan. *See id.* On appeal, the Tennessee Supreme Court disagreed, holding that "the conduct of a negligent defendant should not be compared with the intentional conduct of another in determining comparative fault where the intentional conduct is the foreseeable risk created by the negligent tortfeasor." *Id.* at 823.

In light of the rule set forth in *Jordan*, we must now consider whether the conduct of the fleeing suspects in the instant case may be classified as intentional. Under Tennessee's criminal statutes, the word intentional "refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(18) (1997);

Tenn. Code Ann. § 39-11-302(a) (1997). The Restatement (Second) of Torts uses the word intent "to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." Restatement (Second) of Torts § 8A (1965).

In an attempt to emphasize the distinction between conduct that is intentional and conduct that is merely negligent or reckless, the drafters of the Restatement (Second) of Torts offer the following illustration:

> 2. On a curve in a narrow highway A, without any desire to injure B, or belief that he is substantially certain to do so, recklessly drives his automobile in an attempt to pass B's car. As a result of this recklessness, A crashes into B's car, injuring B. A is subject to liability to B for his reckless conduct, but is not liable to B for any intentional tort.

Restatement (Second) of Torts § 8A illus. 2 (1965). Similarly in the instant case, there is no allegation that the fleeing suspects desired to injure Trevor, Jona, or Jessica. Nor is there any allegation that the fleeing suspects believed that their conduct was substantially certain to result in injuries to the persons contained in the McCracken vehicle. On the contrary, as suggested by the Plaintiff's own expert witness, a suspect who is fleeing the police typically attempts to avoid apprehension by blending into traffic and remaining inconspicuous until the suspect has an opportunity to stop his or her vehicle and hide from the police. It stands to reason, then, that a suspect who is attempting to blend into traffic and remain inconspicuous would not intentionally crash into the vehicle of an innocent bystander.

In its memorandum opinion, the trial court makes reference to the "reckless driving of the criminals." For the reasons set forth above, we think that the trial court properly characterized the suspects' conduct as reckless rather than intentional. Thus, we find that the rule set forth in *Jordan* is inapplicable to the case at bar. Accordingly, we reject the Plaintiff's argument that, under *Jordan*, the trial court was not permitted to compare the fault of the fleeing suspects with the fault of Officers Rose and Fields.

As stated above, we agree with the Plaintiff that, under *George*, the trial court should

not have considered the fault of the fleeing bank robbery suspects when determining the Defendant's degree of fault. However, we are unable to find anything in the record suggesting that the Plaintiff objected at trial to the court apportioning fault in this manner. On the contrary, counsel for the Plaintiff apparently conceded that the fault of Officers Rose and Fields would be compared with the fault of the fleeing bank robbery suspects, stating during closing arguments as follows:

> I think the Court is to apply a comparative fault analysis and I do believe that a great deal of the fault must be cast against [the bank robbery suspects]. . . .
>
> . . . .
>
> . . . Judge, I think that [the Defendant] ought to be held 25 percent responsible. I think that's fair. That's what we ask this Court to do is find that the City of Millington was 25 percent at fault.

Thus, the Plaintiff's position at trial with respect to this issue is contrary to the position that the Plaintiff asserts on appeal. It is well settled that, under Tennessee law, an issue cannot be raised for the first time on appeal. *See, e.g., Simpson v. Frontier Community Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991); *State Dept. of Human Servs. v. Defriece*, 937 S.W.2d 954, 960 (Tenn. App. 1996). In the instant case, the Plaintiff did not raise an objection at the trial court level with respect to the trial judge's method of apportioning fault. Consequently, the trial judge did not have an opportunity to correct its ruling so as to conform to our supreme court's holding in *George*. Under such circumstances, we find that the Plaintiff has waived the right to raise any issue on appeal with respect to the trial court's apportionment of fault.

### Damages of Jona McCracken

In her complaint, Jona sought compensatory damages in the amount of $100,000.00. When assessing Jona's damages, however, the trial court found that she had sustained a total of $175,000.00 in compensatory damages.[6] The Defendant presented an issue on appeal that, because the court found that Jona had sustained damages in excess of those sought in her complaint, the

---

[6]The court also found that Jona had sustained consortium-type damages during the two days that Trevor survived after the accident and valued these damages at $10,000.00.

court's finding with respect to Jona's damages should be reduced.[7] Under Tennessee law, a trial court may not enter a judgment in excess of the amount sought in the plaintiff's complaint. *See Gaylor v. Miller*, 59 S.W.2d 502, 504 (Tenn. 1933)(citing *Murphy v. Johnson*, 64 S.W. 894, 895 (Tenn. 1901)); *Cross v. City of Morristown*, No. 03A01-9606-CV-00211, 1996 WL 605248, at *2 (Tenn. App. Oct. 23, 1996)(citations omitted). *See also* T.R.C.P. 15.02 ("amendment after verdict so as to increase the amount sued for in the action shall not be permitted"). This rule refers to the amount of the plaintiff's judgment, not the trial court's preliminary assessment of the plaintiff's damages. In the instant case, the trial judge reduced the amount of Jona's damages to reflect the Defendant's degree of fault, ultimately entering a judgment in favor of Jona in the amount of $46,250.00. This amount does not exceed $100,000.00, the amount sought by Jona in her complaint.

The Defendant also contends that the trial court erred in finding that Jona was entitled to recover damages under the theory of negligent infliction of emotional distress. In *Camper v. Minor*, 915 S.W.2d 439 (Tenn. 1996), the Tennessee Supreme Court abandoned the physical manifestation or injury rule and adopted a general negligence approach to claims of negligent infliction of emotional distress. *See id.* 446. Under this approach, the plaintiff may recover only if the defendant's conduct was negligent and, as a result of the defendant's negligence, the plaintiff sustained a serious or severe emotional injury. *See id.* The court noted in *Camper* that it was not necessarily abandoning the zone of danger test, stating as follows: "[S]ince the 'zone of danger' approach is, in reality, merely a way of defining and limiting the elements of duty and proximate or legal cause, the principles of the approach can likely be integrated into the general negligence framework." *Id.* at 446 n.2.

In *Ramsey v. Beavers*, 931 S.W.2d 527 (Tenn. 1996), the court attempted to explain the operation of the zone of danger test within the context of the general negligence approach. The court held in *Ramsey* that, in order to recover for emotional injuries sustained as a result of the injuries of a third person, the plaintiff must prove that the defendant's conduct was a cause in fact of both the third party's injury and the plaintiff's emotional injury. *See id.* at 531. Additionally, the plaintiff must prove that his or her emotional injury was the foreseeable result of the defendant's

---

[7]We must note, however, that the Defendant has subsequently abandoned this argument and now concedes that, in the instant case, the amount of the judgment was not in excess of the amount sought in Jona's complaint.

conduct.  *See id.*  In determining whether the plaintiff's emotional injury was foreseeable, the trier

of fact should consider (1) the plaintiff's physical location at the time of the injury-producing event

as well as the plaintiff's awareness of the injury-producing event, (2) the seriousness of the third

party's injury, and (3) the nature of the plaintiff's relationship with the injured third party.  *See id.*

With respect to the first of these considerations, the court explained as follows:

> Obviously, it is more foreseeable that one witnessing or having a sensory observation of the event will suffer effects from it.  As has been explained:
>
> > The impact of personally observing the injury-producing event in most, although concededly not all, cases distinguishes the plaintiff's resultant emotional distress from the emotion felt when one learns of the injury or death of a loved one from another, or observes pain and suffering but not the traumatic cause of the injury.

*Id.* (quoting *Thing v. La Chusa*, 771 P.2d 814, 828 (Cal. 1989))(footnote omitted).  The court then

summarized its ruling as follows:

> Our holding today abandons the hypertechnical approach of the zone of danger rule and recognizes that in certain circumstances a plaintiff whose physical safety is not endangered may nonetheless suffer compensable mental injury as a result of injuries to a closely related third person which plaintiff observes sensorily.

*Id.* at 532.

In determining whether Jona was entitled to recover damages under the theory of

negligent infliction of emotional distress, our inquiry focuses primarily on the first of the three

foreseeability factors discussed in *Ramsey*.  At the time of the accident, Jona was a passenger in one

of the vehicles that was involved in the collision.  Thus, Jona's physical proximity to the injury-

producing event could not have been any closer.  We must also consider, however, Jona's awareness

of the injury-producing event.  Jona testified that both she and Jessica were asleep when the accident

occurred.  Sometime thereafter, Jona woke up and was lying on the ground.  As she opened her eyes,

Jona observed trees and leaves but apparently was not able to see the scene of the accident.  Jona

testified that she remembered hearing commotion and being questioned by a paramedic.  She could

not, however, recall the substance of the paramedic's questions. Jona's next memory is of being inside an ambulance with Jessica. While inside the ambulance, Jona observed that Jessica was crying and holding her arms out to her. The next thing that Jona remembered was being at The Naval Hospital surrounded by her friends and neighbors. Jona was told that she was going to be alright, that Trevor was fine, and that Jessica had broken her leg. Jona testified at trial that, when she woke up at The Naval Hospital, she did not even really know what had happened.

Under the aforementioned circumstances, we are not convinced that Jona had sufficient awareness of the injury-producing event to satisfy the requirements of *Ramsey*. The court in *Ramsey* limited recovery for negligent infliction of emotional distress to cases in which the plaintiff actually observed the injury-producing event with his or her senses. *See Ramsey*, 931 S.W.2d at 531-32. It recognized however, that the requisite sensory observation does not necessarily have to be a visual one, noting that it is possible to audibly observe an injury-producing event. *See id.* at 531 n.2. In the instant case, the trial judge noted that Jona had no memory of the collision itself but nevertheless concluded that "[h]er senses must have received some impact from it." While we certainly agree that Jona's body must have received a physical impact as a result of the collision, we do not think that this necessarily establishes that Jona was aware of this impact. On the contrary, the trial court found that "[a]pparently she was knocked unconscious instantly by the collision." Under *Ramsey*, the crucial inquiry is whether the plaintiff was aware of the injury-producing event, not whether the plaintiff received a physical impact from the event. *See id.* 531. Because Jona was sleeping immediately prior to the accident and was knocked unconscious at the moment of impact, she could not have had any conscious awareness of what had occurred. Thus, we must conclude that Jona has failed to establish sufficient awareness of the event to allow recovery for her emotional injuries under *Ramsey*.

Even assuming that Jona's emotional injuries were foreseeable, however, we would still find that Jona is not entitled to recover damages for negligent infliction of emotional distress. A plaintiff may recover under this legal theory only if he or she has suffered a serious or severe emotional injury. *See Ramsey*, 931 S.W.2d at 532; *Camper*, 915 S.W.2d at 446 (citations omitted). Additionally, the plaintiff's serious or severe injury must be supported by expert medical or scientific proof. *See Ramsey*, 931 S.W.2d at 532; *Camper*, 915 S.W.2d at 446 (citing *Leong v.*

*Takasaki*, 520 P.2d 758, 766-67 (Haw. 1974)). The plaintiff's injury is sufficiently serious or severe if "a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Ramsey*, 931 S.W.2d at 532 (quoting *Camper*, 915 S.W.2d at 446). In the instant case, the trial judge found that Jona had sustained "some" emotional injury as a result of the accident. The court then noted that Jona had "witnessed her husband in a grotesquely swollen and injured condition in the hospital." In *Ramsey*, however, the court clearly indicated that the requisite emotional injury could not be one sustained as a result of observing the "pain and suffering [of the injured party] but not the traumatic cause of the injury." *Ramsey*, 931 S.W.2d at 531 (quoting *Thing*, 771 P.2d at 828). Approximately four months after the accident, Jona was examined by a psychiatrist who diagnosed Jona's condition as a grief reaction, gave her a prescription of sleeping pills, and recommended that Jona undergo individual counseling.[8] While we agree that a person who has experienced grief has certainly suffered an emotional injury, we do not think this type of emotional injury is compensable under *Ramsey*. Again, *Ramsey* allows a plaintiff to recover damages for an emotional injury sustained as a result of observing the injury-producing event, not an emotional injury experienced "when one learns of the injury or death of a loved one from another." *Ramsey*, 931 S.W.2d at 531 (quoting *Thing*, 771 P.2d at 828). Additionally, we find that Jona has failed to prove by expert medical or scientific proof that her emotional injuries were severe or serious. According to Jona's psychiatrist, her symptoms were "within the normal grieving process and may not lead to any future long term complications." Thus, under the definition of "severe or serious injury" adopted by our supreme court in *Camper* and *Ramsey*, we conclude that Jona has failed to carry her burden of proof with respect to this issue.

In light of our discussion above, we find that the requirements of *Ramsey* have not been satisfied in the instant case and consequently hold that the trial court erred in its assessment of Jona's damages. On remand, the court should reduce its prior assessment of Jona's damages by $100,000.00, the amount that the court assigned as damages for negligent infliction of emotional distress.

The trial court also found that, in addition to the emotional injuries discussed above,

---

[8]There is no evidence in the record, however, suggesting that Jona actually received any future counseling.

Jona sustained damages for her own personal injuries in the amount of $75,000.00. The Defendant argues on appeal that this figure is excessive and allows Jona to receive a double recovery for her emotional injuries. We disagree. Jona's physical injuries resulting from the accident included a severely sprained left ankle, a severely bruised upper thigh, and various cuts, bumps, and bruises. Although these injuries healed, there is permanent scar tissue on Jona's right leg that, when bumped, causes Jona to experience pain. A plaintiff who is injured as a result of the negligence of the defendant is entitled to "reasonable compensation for bodily injuries, pain and suffering, disability, loss of earnings and expenses." *Brown v. Null*, 863 S.W.2d 425, 430 (Tenn. App. 1993). There are no mathematical rules for computing damages in a negligence case. *See, e.g., id.* at 429-30. Rather, the amount to be awarded in such a case is primarily within the discretion of the trier of fact. *See, e.g, id.* at 430 (citations omitted). In the instant case, it is undisputed that Jona incurred only $367.00 in medical expenses. However, she also experienced pain and suffering and has at least some permanent disability or impairment that may, in fact, cause her some pain and suffering in the future. Under these circumstances, we cannot say that the evidence preponderates against the trial court's conclusion that Jona sustained $75,000.00 in damages as a result of her personal injuries. Thus, even if the trial court improperly considered Jona's mental suffering when making its assessment of these injuries, we do not think that the figure ultimately reached by the trial court is excessive.

### *Damages of Jessica McCracken*

As a result of the accident, Jessica sustained a fracture to her left leg. For eight weeks, Jessica was required to wear a cast that extended from the top of her toes to the middle of her thigh. The parties stipulated at trial that, as a result of this injury, Jessica incurred medical bills totaling $304.00. The trial court found that Jessica had sustained a total of $80,308.00 in damages. The Defendant argues on appeal that this amount is excessive and represents a subconscious attempt on the part of the trial judge to circumvent the rules of comparative fault. We cannot agree. Again, we must note that the assessment of damages in a negligence case is largely left to the sound discretion of the trier of fact. *See, e.g, Brown*, 863 S.W.2d at 430 (citations omitted). Jessica undoubtedly experienced a great deal of pain as a result of her fractured leg. Additionally, the child must have experienced considerable suffering associated with having the leg immobilized for a

period of eight weeks. Thus, although the trial court's assessment of Jessica's damages appears somewhat high in light of the small amount of her medical expenses, we cannot say that it is contrary to the preponderance of the evidence. Accordingly, we find no error on the part of the trial court with respect to its assessment of Jessica's damages.

### *Discretionary Costs*

After the trial court rendered its judgment, the Plaintiff filed a motion for discretionary costs totaling $21,957.80. The amount sought by the Plaintiff included the $11,040.00 expert witness fee of Dr. Geoffery Alpert and the $7,596.50 expert witness fee of Michael Cosgrove. The Plaintiff subsequently filed an amended bill of costs wherein the Plaintiff stated that approximately $2,025.00 of Dr. Alpert's fee and $975.00 of Cosgrove's fee was incurred prior to the dismissal of the named defendants other than the City of Millington. Based on these calculations, the Plaintiff amended her motion for discretionary cost to seek only $9,015.00 for the expert witness fee of Dr. Alpert and $6,621.50 for the expert witness fee of Cosgrove. After hearing oral argument on the Plaintiff's amended motion, the trial judge entered an order awarding the Plaintiff $17,335.30 in discretionary costs. In its order, the trial judge denied the Plaintiff's requests for travel expenses and expenses associated with preparation of the trial transcript totaling $2,222.50. The court then stated that the Plaintiff was entitled to 1/5 or $600.00 of the $3,000.00 in expert witness fees incurred prior to the dismissal of the other named defendants. Finally, the court granted all other aspects of the Plaintiff's motion for discretionary costs. Thus, according to our calculations, the total amount awarded to the Plaintiff for the expert witness fees of Dr. Alpert and Cosgrove is $16,236.50.

Under the Tennessee Rules of Civil Procedure, discretionary costs include "reasonable and necessary court reporter expenses for depositions or trial, ***reasonable and necessary expert witness fees*** for depositions or trials, and guardian ad litem fees." T.R.C.P. 54.04(2)(emphasis added). On appeal, the Defendant argues that the Plaintiff was not entitled to recover the expert witness fees of Dr. Alpert and Cosgrove because the testimony of these witnesses was not necessary. After taking the instant case under advisement, the trial judge stated as follows:

I feel called upon to say that the expert testimony, without any

> disrespect to the gentlemen that testified, I don't think was very helpful to the Court at all. It dealt mainly with people putting their own interpretation on the facts that I'm not sure that the Court or that a juror wouldn't be in just as good a position to do as anyone, although they were unquestionably policemen of great experience. So I'll just mention that for whatever it's worth . . . .

In light of the trial judge's comment that the testimony of Dr. Alpert and Cosgrove was "not very helpful . . . at all," it would be inconsistent for the trial judge to find that their testimony was "necessary." Thus, because expert witness fees may be awarded as discretionary costs only if they are necessary, we agree that the trial judge in the instant case should not have awarded the Plaintiff $16,236.50 for the expert witness fees of Dr. Alpert and Cosgrove.

The Defendant also argues that, because the trial court found that it was only twenty-five percent at fault, the court erred in requiring it to pay the entire amount awarded to the Plaintiff as discretionary costs. In *Hollifield v. City of Morristown*, No. 03A01-9605-CV-00172, 1996 WL 539766 (Tenn. App. Sept. 25, 1996), we expressly rejected the contention that, in comparative fault cases, costs must be assessed according to the party's degree of fault. *See id.* at *2. Thus, we find this argument of the Defendant to be without merit.

As the name suggests, trial judges are afforded a great deal of discretion when considering a motion for discretionary costs. Absent a clear abuse of discretion, appellate courts generally will not interfere with a trial court's assessment of costs. *See, e.g., Perdue v. Green Branch Mining Co.*, 837 S.W.2d 56, 60 (Tenn. 1992). In the instant case, we think that the trial court clearly abused its discretion in awarding as discretionary costs of the fees the Plaintiff's expert witnesses. We find no abuse of discretion, however, with respect to the trial judge's decision to assess 100% of the amount awarded as discretionary costs against the Defendant. Thus, on remand, the trial judge should reduce that amount of the award by $16,236.50, ultimately awarding the Plaintiff $1,098.80 as discretionary costs. Additionally, 100% of the $1,098.80 award should be assessed against the Defendant.

*Loss of Spousal and Parental Consortium*

At trial, Jona and Jessica both sought loss of consortium damages for the wrongful death of Trevor. The trial judge, however, ruled that Jona and Jessica were not entitled to recover consortium-type damages under Tennessee's wrongful death statutes. We now consider whether, in light of our supreme court's recent decision in *Jordan v. Baptist Three Rivers Hosp.*, No. 01S01-9706-CV-00142, 1999 WL 24677 (Tenn. Jan. 25, 1999),[9] the trial court erred in failing to award Jona and Jessica damages for loss of spousal and parental consortium.

Under Tennessee law, a cause of action for wrongful death is recognized by statute. *See* Tenn. Code Ann. §§ 20-5-101 to -120 (1994 & Supp. 1998). The types of damages that are recoverable in a wrongful death case are outlined in section 20-5-113 of the Tennessee Code Annotated which provides as follows:

> Where a person's death is caused by the wrongful act, fault, or omission of another, and suit is brought for damages, as provided for by §§ 20-5-106 and 20-5-107, the party suing shall, if entitled to damages, have the right to recover for the mental and physical suffering, loss of time, and necessary expenses resulting to the deceased from the personal injuries, and also the damages resulting to the parties for whose use and benefit the right of action survives from the death consequent upon the injuries received.

Tenn. Code Ann. § 20-5-113 (1994). Tennessee courts have classified this provision as a survival statute because it vests in a designated survivor whatever cause of action the injured party had against the defendant prior to his or her death. *See Milligan v. American Hoist & Derrick Co.*, 622 F. Supp. 56, 59 (W.D. Tenn. 1985); *Jones v. Black*, 539 S.W.2d 123, 124 (Tenn. 1976). Additionally, the courts of this state have repeatedly rejected the notion that section 20-5-113 creates a new cause of action in favor of the injured party's survivors for their loss resulting from the injured party's death. *See Jamison v. Memphis Transit Management Co.*, 381 F.2d 670, 673 (6th Cir. 1967); *Harmon v. Wolfe*, 253 F. Supp. 577, 578 (E.D. Tenn. 1965); *Jones*, 539 S.W.2d at 124; *Southeastern Aviation, Inc. v. Hurd*, 355 S.W.2d 436, 442 (Tenn. 1962); *Logan v. Reaves*, 354 S.W.2d 789, 790 (Tenn. 1962); *Herrell v. Haney*, 341 S.W.2d 574, 576 (Tenn. 1960); *Memphis*

---

[9]This case has been designated for publication.

*St. Ry. Co. v. Cooper*, 313 S.W.2d 444, 447-48 (Tenn. 1958); *Love v. Southern Ry. Co.*, 65 S.W. 475, 480 (Tenn. 1901); *Whaley v. Catlett*, 53 S.W. 131, 133 (Tenn. 1899); *Rogers v. Donelson-Hermitage Chamber of Commerce*, 807 S.W.2d 242, 245 (Tenn. App. 1990).

In *Davidson Benedict Co. v. Severson*, 72 S.W. 967 (Tenn. 1903), our supreme court held that survivors could not recover consortium-type damages under Tennessee's wrongful death statutes. *See id.* at 982 (stating that "nothing can be allowed . . . for the loss of the aid, comfort, counsel, and companionship of the deceased"). *See also Louisville & N.R. Co. v. Tucker*, 211 F.2d 325, 333 (6th Cir. 1954); *Knight v. Nurseryman Supply, Inc.*, 248 F. Supp. 925, 926 (E.D. Tenn. 1965); *Illinois Cent. R. Co. v. Bentz*, 69 S.W. 317, 320 (Tenn. 1902). Nearly one hundred years later, the Tennessee Supreme Court revisited this holding in the recent case of *Jordan v. Baptist Three Rivers Hosp.* The court in *Jordan* focused on the plain language of section 20-5-113. *See Jordan*, 1999 WL 24677, at *6. The court noted that, despite its classification as a survival statute, section 20-5-113 also provides for a cause of action that compensates survivors for incidental damages sustained as a result of the injured party's death. *See id.* at *6-7 (citing *Thrailkill v. Patterson*, 879 S.W.2d 836, 841 (Tenn. 1994); *Davidson Benedict Co.*, 72 S.W. at 977). Incidental damages, as noted by the court, have been defined to include the pecuniary value of the decedent's life which is calculated by considering the injured party's age, life expectancy, condition of health and strength, earning capacity, and personal habits as to sobriety and industry. *See id.* at *7 (citing *Spencer v. A-1 Crane Serv., Inc.*, 880 S.W.2d 938, 943 (Tenn. 1994)). The court recognized that the pecuniary value of human life necessarily encompasses the value of human companionship. *See id.* Accordingly, the court interpreted section 20-5-113 as allowing the survivor to recover damages for the loss of human companionship resulting from the injured party's death and reversed its earlier ruling in *Davidson Benedict Co.* to the extent that it prohibited the recovery of damages for spousal consortium in wrongful death cases. *See id.*

The court in *Jordan* next considered whether, under Tennessee's wrongful death statutes, a child of the injured party could recover damages for loss of parental consortium. *See id.* at *8. The court first noted that section 20-5-110 of the Tennessee Code Annotated provides that an action for wrongful death may be brought "for the benefit of the surviving spouse and the children of the deceased." *Id.* (quoting Tenn. Code Ann. § 20-5-110 (1994)). The court concluded that, when

read in conjunction with section 20-5-110, section 20-5-113 "seemingly permits consideration of parental consortium damages." *Id.* (citing *Fosters v. Jeffers*, 813 S.W.2d 449, 451 (Tenn. App. 1991)). Noting that many other jurisdictions allow the child of a tortiously killed parent to recover consortium-type damages, the court held that such damages are also recoverable section 20-5-113 as part the pecuniary value of the deceased parent's life. *See id.* at *8-9.

We must now consider whether the holding of *Jordan* may be applied retrospectively to the case at bar. The Tennessee Constitution provides "[t]hat no retrospective law, or law impairing the obligations of contracts, shall be made." Tenn. Const. art. I, § 20. This provision has been interpreted as prohibiting the retrospective application of a statute if such application would disturb a vested substantive right derived from the common law. *See Dupuis v. Hand*, 814 S.W.2d 340, 343 (Tenn. 1991); *Hanover v. Ruch*, 809 S.W.2d 893, 896 (Tenn. 1991); *Miller v. Sohns*, 464 S.W.2d 824, 826 (Tenn. 1971); *Massey v. Sullivan County*, 464 S.W.2d 548, 549 (Tenn. 1971). This prohibition does not, however, prevent the retroactive application of judicial changes in the common law. *See Dupuis*, 814 S.W.2d at 343; *Davis v. Davis*, 657 S.W.2d 753, 759 (Tenn. 1983). *See also Alcazar v. Hayes*, 982 S.W.2d 845, 856 (Tenn. 1998); *McClung*, 937 S.W.2d at 905; *Perez v. McConkey*, 872 S.W.2d 897, 906 (Tenn. 1994); *McIntyre*, 833 S.W.2d at 58 (directing that the common law changes contained in those opinions were to be applied retrospectively to any cases on appeal in which the issue was properly raised in the trial court).

In *Jordan*, the court's ruling did not result in a change in the common law. Rather, *Jordan* involved the judicial construction of a statute. A change in the judicial construction of a statute becomes a part of the statute itself and thus has the same effect as a change in the law by legislation. *See Blank v. Olsen*, 662 S.W.2d 324, 326 (Tenn. 1983)(citations omitted). Consequently, many courts have endorsed the position that a change in the judicial construction of a statute should not be applied retrospectively. *See id.* (citations omitted). In *Blank v. Olsen*, 662 S.W.2d 324 (Tenn. 1983), our supreme court stated as follows:

> There is nothing said in *Pierce* indicating it is to have retrospective effect, and in the absence of such an expressed intent the rule is . . . that the decision overruling a judicial construction of a statute will not be given retroactive effect.

*Id.* at 325. Applying this rule to the case at bar, we think it is significant that, unlike ***Alcazar***, ***McClung***, ***Perez***, and ***McIntyre***, there is no language in ***Jordan*** providing for retrospective application. Absent such an expressed intent, we must conclude that the ***Jordan*** court's new construction of Tennessee's wrongful death statutes may not be applied retrospectively.

Thus, in the instant case, we must review the ruling of the trial court under the law in existence at the time of trial. Prior to ***Jordan***, the courts of this state uniformly held that damages for loss of consortium were not recoverable under Tennessee's wrongful death statutes. We must conclude then, that the trial judge was correct, under the then existing law, in ruling that Jona and Jessica could not recover damages for loss of spousal and parental consortium.

### *Conclusion*

Based on the foregoing, we conclude that the trial court erred in awarding damages to Jona based on the theory of negligent infliction of emotional distress. Additionally, we conclude that the trial court abused its discretion in awarding as discretionary costs the fees of the Plaintiff's expert witnesses. We find no error, however, with respect to the remaining issues raised on appeal. Thus, we affirm in part, reverse in part, and remand to the trial court for further proceedings consistent with this opinion. On remand, the trial court should reduce its assessment of Jona's damages by $100,000.00, the amount assigned as damages for negligent infliction of emotional distress. The court should also reduce the amount awarded as discretionary costs by $16,236.50, the amount the court awarded for the fees of the Plaintiff's expert witnesses.

The costs of this appeal are assessed to the Plaintiff, for which execution may issue if necessary.

_____
FARMER, J.

_____
CRAWFORD, P.J., W.S. (Concurs)



_____
HIGHERS, J. (Concurs)